**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

Eastern District of Kentucky
FILED

NOV 07 2024

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

**UNITED STATES OF AMERICA**

**V.**                                          INDICTMENT NO. 5:24-CR-111-KKC

**DELORES JORDAN,**
**DESHAWN DAWKINS,**
**ERNEST WILLIAMS, and**
**JEROME DAVIS**

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment:

**BACKGROUND ON MEDICARE AND MEDICAID**

1.      The Medicare Program ("Medicare") was a federal "health care benefit program," as defined by 18 U.S.C. § 24(b), that provided benefits to persons who were over the age of sixty-five or disabled.  Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS").

2.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries," and as beneficiaries, they were eligible to receive a variety of goods and services.

3.      The Kentucky Medicaid Program ("Medicaid") was a "health care benefit program," as defined by 18 U.S.C. § 24(b), that provided benefits to Kentucky residents

who met certain eligibility requirements, including income requirements. Medicaid was jointly funded by federal and state sources and administered by CMS and by the Kentucky Cabinet for Health and Family Services, Department for Medicaid Services ("DMS"), located in Franklin County, Kentucky. DMS contracted with managed care organizations ("MCOs") to administer the Medicaid program in Kentucky, and health care providers must have been credentialed with those MCOs in order to receive reimbursement for the services provided.

4.    Individuals who qualified for Medicaid benefits were commonly referred to as "members," and as members, they were eligible to receive a variety of goods and services.

5.    Among a variety of items and services, both Medicare and Medicaid provided coverage to beneficiaries and members for certain laboratory services, including urine drug testing. Medicaid provided coverage to members for various behavioral-health-related services, including alcohol and drug treatment services, professional counseling, peer support services, psychiatry, psychotherapy, therapeutic behavioral health, and case management, in accordance with state regulations.

6.    Medical service providers, including diagnostic testing laboratories meeting certain criteria, and behavioral health service providers, meeting certain criteria, could, obtain provider numbers called National Provider Identifier ("NPI"). Upon Medicare and Medicaid enrollment, service providers were permitted to provide medical services and items to beneficiaries and members, and subsequently submit claims, either electronically

or in hardcopy, to Medicare and Medicaid, through fiscal intermediaries, seeking reimbursement for the cost of services and items provided.

7.      When seeking reimbursement from Medicare, Medicaid and MCOs, service providers certified that: (1) the contents of the claim forms were true, correct, and complete; (2) the claim forms were prepared in compliance with the laws and regulations governing Medicare and Medicaid; and (3) the services purportedly provided, as set forth in the claim forms, were medically necessary.

8.      Medicare and Medicaid reimbursed claims submitted by service providers if the services and items provided were medically necessary for the diagnoses and treatment of beneficiaries and members. Conversely, Medicare and Medicaid did not cover and would not reimburse claims for services and items that were not medically necessary.

9.      Medicaid regulations provided that a service, including urine drug testing, was medically necessary if, inter alia, it was (a) based on an individualized assessment of the recipient's medical needs; (b) reasonable and required to identify, diagnose, or treat a disease, illness, or other medical condition; (c) appropriate in terms of the service, amount, scope, and duration based on generally accepted standards of good medical practice; and (d) provided for medical reasons rather than primarily for the convenience of the individual, the individual's caregiver, or the health care provider. *See* 907 KAR 3:130, Section 2.

10.     The MCOs imposed additional coverage requirements prior to reimbursing for urine drug testing. For example, Humana-Caresource's Medicaid reimbursement

policy stated that urine drug testing performed pursuant to "blanket orders" or "standing orders" would not be reimbursed, nor would urine drug testing performed as a program requirement to live in a residential facility or sober center.  Passport Health Plan's guidance stated that "[s]tanding orders for specific test panels across members, 'routine panels' or 'custom panels' do not meet medical necessity criteria as they are not individualized to members' specific medical needs."  Aetna Better Health of Kentucky's guidance similarly described standing orders for large drug test panels as "medically inappropriate drug testing."

11.     Similarly, Medicare only paid for services that are reasonable and necessary for the diagnosis or treatment of illness or injury.  *See* 42 U.S.C. § 1395y(a)(1)(A).  In the context of diagnostic testing, including urine drug testing, the relevant regulations stated that "[a]ll . . . diagnostic laboratory tests . . . must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  42 C.F.R. § 410.32(a).  Further, Medicare did not pay for urine drug testing conducted pursuant to blanket orders, that is, a test request that was not for a specific patient, but rather was an identical order for all patients in a clinician's practice without individualized decision making at every visit.  *See* Local Coverage Determination L36029.

12.     Behavioral health service providers, meeting certain criteria, were eligible to enroll with Kentucky Medicaid to provide Kentucky members with behavioral health

services. Upon successful enrollment, medical providers obtained a Medicaid provider number. To enroll as a Kentucky Medicaid service provider, providers were required to accurately complete and submit a MAP-811 Provider Application (MAP-811) enrollment form. The MAP-811 form required truthful disclosures, including but not limited to, any owner with a controlling interest, greater than five percent, in the service provider, any owner's past criminal history, and the following obligations and attestations:

a. assumption of the responsibility for appropriate, accurate, and timely submission of claims and encounter data whether submitted directly by the provider or by an agent;

b. use of electronic medical claims submittal procedures and record layouts as defined by Kentucky Medicaid if submitting electronic claims;

c. presence of a provider's signature on the MAP-811 constituted compliance that the transmitted information was true, accurate and complete and any subsequent correction altering the information contained would be transmitted promptly;

d. acknowledgement that claims would be paid using federal and state funds and that any false claims, statements, or documents or concealment of falsification of a material fact, may be prosecuted under applicable laws.

13.     Kentucky Medicaid relied on the accuracy of the MAP-811 and supporting documentation to determine whether a medical service provider was permitted to provide medical services and items to members.

14.     Medicaid regulations provided reimbursement for peer support services, meaning emotional support provided by an adult peer support specialist to others with similar mental health, substance abuse, or co-occurring mental health and substance use disorders in order to achieve a desired social or personal change. Peer support services were structured and scheduled non-clinical therapeutic activities provided to an individual by an adult peer support specialist. Peer support specialists had to be trained and registered with the Commonwealth of Kentucky. Peer support services had to be conducted face-to-face with the individual, provided in-person, and had to be provided under the supervision of a licensed professional, such a licensed clinical social worker. Peer support services not provided in accordance with these, and other regulations, would not be reimbursed by Medicaid.

15.     When seeking reimbursement from Kentucky Medicaid, enrolled behavioral health providers submitted the appropriate "procedure code," as defined by the American Medical Association, and set forth and maintained in the Current Procedural Terminology ("CPT") Manual or by the Healthcare Common Procedure Coding System ("HCPCS") for the services or items provided. Medicaid reimbursed behavioral health service providers designated amounts according to the CPT or HCPCS codes submitted, and the rates set forth in the then-current Medicaid fee schedule. The Medicaid fee

schedule was a list of fees that an MCO used to pay for authorized provider services and
items.

16.     The most common Medicaid procedure codes utilized by behavioral health
service providers covered in this indictment included H0038 (peer support services),
90853 (group psychotherapy), and 90837 (53+ minutes of psychotherapy services).

17.     Medicaid required that certain units of service correspond to actual time
spent delivering a service to a patient.  Medicaid also required services to be stated in a
recipient's plan of care and provided in accordance with a recipient's plan of care.  907
KAR 15:010, Section 1(4)(a)-(b).

## DEFENDANTS AND RELEVANT ENTITIES

18.     Serenity Keeper's LLC ("Serenity Keepers") was a Kentucky corporation
formed by **DELORES JORDAN** on August 20, 2019, based in Fayette County,
Kentucky, in the Eastern District of Kentucky.  Serenity Keepers was a sober home
company that purported to provide mental health and substance abuse treatment services
and housing for individuals enrolled in the program.  Serenity Keepers was enrolled as a
medical provider with the Medicaid program effective May 1, 2020.

19.     **DELORES JORDAN** was formerly a resident of North Carolina, residing
in Louisville, Kentucky and Indiana.  **JORDAN** was the owner and operator of Serenity
Keepers.

20.     **DESHAWN DAWKINS** was a resident of Fayette County, in the Eastern
District of Kentucky.

21.    **ERNEST WILLIAMS** was a resident of Fayette County, in the Eastern District of Kentucky.

22.    **JEROME DAVIS** was a resident of Louisville, Kentucky and Indiana, and was the Registered Agent and Organizer of X-Tremly for Christ Limited Liability Company ("X-Tremly for Christ").

23.    Co-conspirator 1 ("CC-1") was a resident of North Carolina.  CC-1 was business partners with **JORDAN** and an investor in Serenity Keepers.

24.    Co-conspirator 2 ("CC-2") was a resident of Boyle County, in the Eastern District of Kentucky.  CC-2 owned and operated a consulting company that interfaced between medical providers and toxicology laboratories, including Lab 1, Lab 2, and Lab 3.

25.    Lab 1 was a urine drug testing laboratory based in Louisville, Kentucky.

26.    Lab 2 was a urine drug testing laboratory based in Indiana.

27.    Lab 3 was a urine drug testing laboratory based in New Jersey.

## THE DEFENDANTS' SCHEME TO DEFRAUD

28.    Serenity Keepers utilized urine drug testing for their clients for non-medical reasons.  Such reasons included, for example, ensuring sobriety, which was purportedly a condition of participation or residency at Serenity Keepers.  The urine drug testing at Serenity Keepers was not performed for purposes of medical diagnosis and treatment and was not ordered by a treating physician or medical provider.  In addition, the results were not reviewed by a treating physician or medical provider.

29.    Beginning in or around August 2019, **JORDAN** solicited kickbacks from CC-2 in exchange for the referral of urine drug testing from Serenity Keepers to various urine drug testing labs, including Lab 1, Lab 2, and Lab 3.  Beginning on or about October 15, 2019, **JORDAN** received kickbacks from CC-2 or CC-2's company in the form of checks, cash payments, and wire transfers of approximately $1,300 every two weeks to her son, **DESHAWN DAWKINS,** in exchange for the referral of urine drug testing from Serenity Keepers.  Beginning in or around October 2021, **JORDAN** demanded that the amount increase to $5,000, based on the increased volume of urine drug testing Serenity Keepers was referring to the labs.  Beginning in or around November 30, 2021, **JORDAN** demanded and received kickbacks in the form of check and ACH payments of $5,000, every two weeks, to her boyfriend, **JEROME DAVIS**, through his company X-Tremly for Christ LLC, in exchange for the referral of urine drug testing from Serenity Keepers.

30.    **JORDAN** knew that the urine drug testing at Serenity Keepers was not performed for purposes of medical diagnosis and treatment, was not ordered by a treating physician or medical provider, and the results were not reviewed by a treating physician or medical provider or used in directing the care of the patient.

31.    **JORDAN** and CC-2 directed urine drug testing from Serenity Keepers to various labs, including Lab 1 and Lab 2, causing the labs to use the NPI of a nurse practitioner with the initials D.C.  Nurse practitioner D.C. saw Serenity Keepers patients on two occasions in September and October 2019, and ordered urine drug testing for approximately 30 patients.  Nurse practitioner D.C. terminated her relationship with

Serenity Keepers in November 2019 and never reviewed the results of the urine drug testing for any Serenity Keepers patients. Between in or around October 2019 through the present, **JORDAN**, CC-2, and Serenity Keepers did not have the authority to use the NPI of D.C. as a referring provider.

32.    **JORDAN** knew that the nurse practitioner D.C. who purportedly signed the blanket order forms was not treating the clients of Serenity Keepers for addiction or reviewing the results of the tests, but continued to use the NPI of D.C. for urine drug testing for Serenity Keepers patients.

33.    In or around June 2021, **JORDAN** recruited a physician with the initials J.F., whose specialty was obstetrics and gynecology, to serve as the nominal medical director of Serenity Keepers and to refer urine drug testing for Serenity Keepers patients to various labs, including Lab 3. **JORDAN** knew that physician J.F., who signed the blanket order forms for urine drug testing, was not treating the patients of Serenity Keepers for addiction or reviewing the results of the tests.

34.    At **JORDAN's** direction, the urine drug tests referred to Lab 1, Lab 2, and Lab 3, for Serenity Keepers patients, were billed to Medicare, Medicaid, and other health care benefit programs, even though such testing was not performed for purposes of medical diagnosis and treatment, and was therefore medically unnecessary, and was not ordered or reviewed by a treating provider or used in directing the care of the patient.

35.    Between in or around August 2019 through March 2022, **JORDAN** and Serenity Keepers caused approximately $20 million in unnecessary and unlawful urine

drug testing to be billed to Medicaid and approximately $670,000 to be billed to Medicare.

36.    Beginning in or around August 2019, Serenity Keepers used the NPI of certain Licensed Clinical Social Workers ("LCSWs") enrolled with Medicaid as providers.  Beginning in or around August 2019, **JORDAN** and Serenity Keepers used the NPI of certain LCSWs to bill Medicaid for peer support services not provided, not provided by licensed peer support specialists, and not provided in accordance with Kentucky state regulations.  On or about May 1, 2020, Serenity Keepers enrolled with Medicaid as a provider, hiding **JORDAN's** ownership of Serenity Keepers and claiming CC-1 was the sole owner.

37.    Between August 2019 and February 2022, Serenity Keepers, through its direct enrollment with Medicaid or through the NPI of certain LCSWs, billed for six hours of peer support services per day, for every individual enrolled in their program who had Medicaid coverage.  The majority of the services billed for were not provided by a registered peer support specialist, were not supervised by appropriate personnel, were not provided at all, or were not provided in accordance with state regulations governing peer support services.

38.    **WILLIAMS** and **DAWKINS** worked for Serenity Keepers as a Peer Support Specialists ("PSS") and supervised several sober homes.  **WILLIAMS** and **DAWKINS** caused Medicaid to be billed for peer support services not provided, not provided by a registered peer support specialist, not supervised by appropriate personnel, or not provided in accordance with state regulations government peer support services.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### 18 U.S.C. § 1349

39.     Paragraphs 1 through 38 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

40.     From on or about an exact date unknown, but at least August 1, 2019, through at least February 16, 2022, in Fayette County, in the Eastern District of Kentucky, and elsewhere,

**DELORES JORDAN**
**DESHAWN DAWKINS**
**ERNEST WILLIAMS**

did knowingly and willfully, with the intent to further the objects of the conspiracy, combine, conspire, confederate and agree with each other, and others, to commit the crime of health care fraud, that is, to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Medicare, Medicaid, and MCOs, to obtain money and property owned by, and under the custody of Medicare, Medicaid, and MCOs, in connection with the delivery of and payment for health care benefits, items, and services, by means of false and fraudulent pretenses, in violation of 18 U.S.C. § 1347.

41.     It was a purpose of the conspiracy for the Defendants to unlawfully enrich themselves and Serenity Keepers by causing the submission of false and fraudulent claims to Medicare, Medicaid, and other health care benefit programs for urine drug testing services referred from Serenity Keepers that were medically unnecessary and ineligible for reimbursement.

42.    It was further a purpose of the conspiracy for the Defendants to unlawfully enrich themselves and Serenity Keepers by causing the submission of false and fraudulent claims to Medicaid and other health care benefit programs for peer support services that were fraudulent, medically unnecessary, and ineligible for reimbursement.

43.    The manner and means by which the Defendants sought to accomplish the purpose of the conspiracy included, among others, the conduct set forth in Paragraphs 28 through 38 of this Indictment.

All in violation of 18 U.S.C. § 1349.

### COUNTS 2-11
### Health Care Fraud
### 18 U.S.C. § 1347

44.    Paragraphs 1 through 38 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

45.    On or about the dates enumerated below, in Fayette County and Franklin County, and elsewhere in the Eastern District of Kentucky,

**DELORES JORDAN**

aided and abetted by one another and others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is Medicare, Medicaid, and MCOs, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission to

Medicare, Medicaid, and MCOs, of materially false and fraudulent claims for services, in violation of 18 U.S.C. § 1347.

46.    Specifically, on or about the date ranges listed, in the Eastern District of Kentucky, and elsewhere, **JORDAN** executed and attempted to execute the scheme described above by submitting and causing the submission of claims for reimbursement as set forth below – each Medicaid beneficiary constituting a separate count of this Indictment.  The claims for payment were submitted for services for (a) urine drug tests that were not performed for purposes of medical diagnosis and treatment, were not ordered by a treating physician or medical provider, and the results of which were not reviewed by a treating physician or medical provider or used in directing the care of the patient, and (b) peer support services that were not provided by a registered peer support specialist, were not supervised by appropriate personnel, were not provided at all, and were otherwise not provided in accordance with state regulations governing peer support services.

| Count | Patient Initials | Approximate Alleged Service Dates | Service Billed | Paid Claim Amount |
|---|---|---|---|---|
| 2 | D.R. | 9/16/19-11/11/19 | Urine Drug Testing (referred by D.C.) | 12 claims; total of $2,370.48 |
| 3 | W.H. | 12/20/19-4/1/20 | Urine Drug Testing (referred by D.C.) | 47 claims; total of $2,643.32 |
| 4 | S.K. | 2/19/20-3/11/20 | Urine Drug Testing (referred by D.C.) | 16 claims; Total of $1,994.08 |
| 5 | S.K. | 9/1/21-2/15/22 | Peer Support | 113 claims; total of $23,350.32 |

| 6 | S.K. | 9/3/21-2/15/22 | Urine Drug Testing (referred by J.F.) | 88 claims; Total of $8,047.14 |
|---|------|----------------|---------------------------------------|-------------------------------|
| 7 | B.W. | 8/25/21-2/16/22 | Peer Support | 109 claims; total of $21,903.84 |
| 8 | B.W. | 8/26/21-2/17/22 | Urine Drug Testing (referred by J.F.) | 75 claims; total of $2,374.74 |
| 9 | A.F. | 1/13/22-2/17/22 | Urine Drug Testing (referred by J.F.) | 21 claims; total of $1,927.89 |
| 10 | S.R. | 1/10/22-2/15/22 | Peer Support | 27 claims; total of $5,579.28 |
| 11 | S.R. | 1/10/22-2/15/22 | Urine Drug Testing (referred by J.F.) | 22 claims; total of $2,039.73 |

All in violation of 18 U.S.C. § 1347.

## COUNT 12
### The Kickback Conspiracy
### 18 U.S.C. § 371

47.     Paragraphs 1 through 38 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

48.     From on or about August 19, 2019, through on or about February 4, 2022, in Fayette County, in the Eastern District of Kentucky, and elsewhere,

**DELORES JORDAN**
**DESHAWN DAWKINS**
**JEROME DAVIS**

knowingly and willfully conspired and agreed with each other and other persons both known and unknown to the grand jury to violate the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), by knowingly and willfully soliciting and receiving remuneration in return

for referring individuals to a person for the furnishing or arranging for the furnishing of items and services for which payment was made in whole or in part under a Federal health care program, to wit, the Medicare and Medicaid programs.

Manner and Means of the Conspiracy

49.    It was part of the conspiracy that **JORDAN** solicited kickbacks from CC-2 in exchange for the referral of urine drug testing from Serenity Keepers to various urine drug testing labs, including Lab 1, Lab 2, and Lab 3. **JORDAN** received kickbacks in exchange for the referral of urine drug testing from Serenity Keepers in the form of check, cash, and electronic payments of approximately $1,300 to her son, **DESHAWN DAWKINS**.

50.    Beginning in or around October 2021, **JORDAN** demanded that the kickbacks increase in amount to $5,000.

51.    Subsequently, **JORDAN** demanded and received kickbacks in exchange for the referral of urine drug testing from Serenity Keepers in the form of consulting payments of $5,000 to her boyfriend, **JEROME DAVIS,** paid as checks or ACH payments to his company X-Tremly for Christ LLC.

52.    Between August 2019 and March 2022, **JORDAN** and Serenity Keepers caused Medicaid and Medicare to pay Lab 1 approximately $234,832 for urine drug testing referred to Lab 1 in exchange for unlawful kickbacks from CC-2.

53.    Between December 2019 and October 2021, **JORDAN** and Serenity Keepers caused Medicaid and Medicare to pay Lab 2 approximately $1,584,321 for urine drug testing referred to Lab 2 in exchange for unlawful kickbacks from CC-2.

54.   Between July 2021 and March 2022, **JORDAN** and Serenity Keepers caused Medicaid and Medicare to pay Lab 3 approximately $750,792 for urine drug testing referred to Lab 1 in exchange for unlawful kickbacks from CC-2.

Overt Acts

55.   In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Kentucky, and elsewhere:

a.   On or about November 1, 2019, CC-2 paid **DAWKINS** check #1031, in the amount of $1,500.

b.   On or about March 13, 2020, CC-2 paid **DAWKINS** check #1049, in the amount of $1,300.

c.   On or about March 27, 2020, CC-2 paid **DAWKINS** check #1050, in the amount of $1,300.

d.   On or about April 13, 2020, CC-2 paid **DAWKINS** check #1341, in the amount of $1,300.

e.   On or about April 27, 2020, CC-2 paid **DAWKINS** check #1151, in the amount of $1,300.

f.   On or about May 8, 2020, CC-2 paid **DAWKINS** check #1152, in the amount of $1,300.

g.   On or about November 25, 2020, CC-2 paid **DAWKINS** $1,300 via Apple Cash.

h. On or about December 7, 2020, CC-2 paid **DAWKINS** $1,300 via Apple Cash.

i. On or about December 21, 2020, CC-2 paid **DAWKINS** $1,300 via Apple Cash.

j. In or about October 2021, **JORDAN** demanded that CC-2 begin making payments of $5,000.

k. In or about October 2021, CC-2 paid **JORDAN** $5,000 in cash in Lexington, Kentucky.

l. In or about November 2021, **JORDAN** directed CC-2 to make the $5,000 as consulting payments to **DAVIS** through his company, X-Tremly for Christ LLC.

m. On or about November 30, 2021, CC-2 paid **DAVIS**, through his company X-Tremly for Christ LLC, check #1136, in the amount of $5,000.

n. On or about December 14, 2021, CC-2 paid **DAVIS**, through his company X-Tremly for Christ LLC, $5,000 via ACH wire transfer.

o. On or about December 24, 2021, CC-2 paid **DAVIS**, through his company X-Tremly for Christ LLC, $5,000 via ACH wire transfer.

p. On or about January 7, 2022, CC-2 paid **DAVIS**, through his company X-Tremly for Christ LLC, $5,000 via ACH wire transfer.

q. On or about January 21, 2022, CC-2 paid **DAVIS**, through his company X-Tremly for Christ LLC $5,000, via ACH wire transfer.

r. On or about February 4, 2022, CC-2 paid **DAVIS**, through his company X-Tremly for Christ LLC, $5,000 via ACH wire transfer.

s. Between in or about October 2019 and February 2022, **JORDAN,** through **DAWKINS** and **DAVIS**, received at least $90,000 in kickbacks from CC-2 for the referral of urine drug testing to Lab 1, Lab 2, and Lab 3.

All in violation of 18 U.S.C. § 371.

## FORFEITURE ALLEGATIONS
### 18 U.S.C. § 981(a)(1)(C)
### 18 U.S.C. § 982(a)(7)
### 28 U.S.C. § 2461(c)

1. By virtue of the commission of the offenses alleged in Counts 1 through 10 of the Indictment, **DELORES JORDAN, DESHAWN DAWKINS, ERNEST WILLIAMS,** and **JEROME DAVIS** shall forfeit to the United States any and all property, real or personal, that constitutes or is derived from proceeds traceable to the violations of 18 U.S.C. §§ 1349, 1347 and 371. Any and all interest that **DELORES JORDAN, DESHAWN DAWKINS, ERNEST WILLIAMS,** and **JEROME DAVIS** have in this property are vested in and forfeited to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c).

2. The property to be forfeited includes, but is not limited to, the following:

**MONEY JUDGMENT:**
A forfeiture money judgment in the amount of proceeds obtained by the Defendants as a result of the violations alleged in the Indictment.

3.    If any of the property listed above, as a result of any act or omission of the Defendants, (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty, the United States shall be entitled to forfeit substitute property pursuant to 21 U.S.C. § 853(p).

**A TRUE BILL**

██████████████

**FOREPERSON**

**CARLTON S. SHIER, IV**
**UNITED STATES ATTORNEY**

## PENALTIES

**COUNTS 1-11:**   Not more than 10 years imprisonment, a fine of not more than $250,000 or the greater of twice the gross gain or twice the gross loss, and supervised release of not more than 3 years.

**COUNT 12:**   Not more than 5 years imprisonment, a fine of not more than $250,000 or the greater of twice the gross gain or twice the gross loss, and supervised release of not more than 3 years.

**PLUS:**   Mandatory special assessment of $100 per count.

**PLUS:**   Restitution, if applicable.

**PLUS:**   Forfeiture as listed.